Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Block]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN HAWKINS derivatively on behalf of AMPLITUDE, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| SPENSER SKATES, HOANG VUONG, NEERAJ AGRAWAL, RON GILL, PAT GRADY, CURTIS LIU, ERICA SCHULTZ, ELISA STEELE, ERIC VISHRIA, JAMES WHITEHURST, and CATHERINE WONG | |
| Defendants, | **DEMAND FOR JURY TRIAL** |
| and | |
| AMPLITUDE, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiff Brian Hawkins ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Amplitude, Inc. ("Amplitude" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Spenser Skates ("Skates"), Hoang Vuong ("Vuong"), Neeraj Agrawal ("Agrawal"), Ron Gill ("Gill"), Pat Grady ("Grady"), Curtis Liu ("Liu"), Erica Schultz ("Schultz"), Elisa Steele ("Steele"), Eric Vishria ("Vishria"), James Whitehurst ("Whitehurst"), and Catherine Wong ("Wong"), (collectively, the "Individual Defendants," and together with Amplitude, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Amplitude, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and against Defendants Skates and Vuong for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon Plaintiff's own knowledge and own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amplitude, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Amplitude's directors and officers from September 21, 2021 through February 16, 2022, both dates inclusive (the "Relevant Period").

2.     Amplitude is a technology company that provides a digital analytics platform which helps businesses analyze data for their digital products and track their customers interactions with them. The Company defines this process as "digital optimization." Amplitude's main product offering, the software called "Amplitude Analytics," provides product analytics tools so that businesses can process how customers interact with their products and reconstruct user visits with their products in real-time. As

such, Amplitude's business mainly generates revenue from selling subscriptions to the Amplitude Analytics platform.

3. Throughout the Relevant Period, the Individual Defendants claimed that Amplitude's revenue was quickly accelerating based on "strong demand for [ Amplitude's products]" and a "robust" expansion from current customers. For instance, in referencing the Company's second quarter of 2021 ("2Q21") earnings, the Individual Defendants represented that "revenue growth accelerated" during 2Q21 and was "up 66% year-over-year." Additionally, the Individual Defendants represented that the Company's main performance indicator, known as current remaining performance obligations ("cRPO"), was up 76% year-over-year and that Amplitude's dollar-based net retention rate ("NRR") was 119%.

4. Amplitude conducts its business in the emerging market of digital optimization. The novelty of this market, combined with Amplitude's slow profit turnaround, made continued growth essential to Amplitude's success. Throughout the Relevant Period, the Individual Defendants failed to disclose any reason for concern regarding even the possibility of revenue acceleration halting or decreasing. In fact, during the Company's 2Q21 earnings call ("2Q21 Earnings Call")—held just days before the Company's anticipated initial public offering—Amplitude's Chief Financial Officer ("CFO"), Defendant Vuong, reaffirmed that Amplitude's revenue acceleration would be maintainable, responding in the affirmative by stating "Yes" when asked whether Amplitude's growth achieved during 2Q21 was sustainable.

5. The Company employed a "land-and-expand strategy" for revenue growth which focused on marketing new products while emphasizing the benefits of increased usage to existing customers. For instance, the Individual Defendants highlighted the "land-and-expand strategy" for revenue growth in the Company's SEC filings, representing that "customers experience the value of our platform in helping to drive business outcomes in that initial use case, they frequently expand that initial use case, expand into new use cases, and expand into additional products."

6. Indeed, the Individual Defendants depicted the accelerated expansion of the Company as "robust" in the earnings report for 2Q21 (the "2Q21 Earnings Report"), and described customer demand

for the digital analytics platform as "strong" in the earnings report for the third quarter of 2021 ("3Q21 Earnings Report"). In reference to the Company's 2Q21 results, Defendant Vuong represented that, "Expansion from existing customers were particularly robust as the team continued to execute well on our land-and-expand strategy." Further, in reference to Amplitude's third quarter of 2021 ("3Q21") financial results, Defendant Skates, the Company's Chief Executive Officer ("CEO"), said, "Existing customer demand for Amplitude was also strong, with expanding customer usage and solid traction with our new products…"

7.      After priming the market with materially false and misleading statements regarding Amplitude's growth prospects, among other things, the Individual Defendants caused the Company to go public via a direct listing initial public offering ("IPO") in September 2021. Amplitude filed a registration statement on Form S-1 (the "Registration Statement") with the SEC on August 30, 2021 in connection with the IPO.[1]

8.      The Registration Statement was declared effective by the SEC on September 21, 2021. That same day, the Company filed a prospectus on Form 424B4 (the "Prospectus") with the SEC in connection with the IPO. The Prospectus incorporated and formed part of the Registration Statement (the Prospectus, collectively with the Registration Statement, the "Offering Documents").

9.      Pursuant to the Offering Documents, on September 28, 2021, Amplitude's common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ"). Amplitude's common stock trades the ticker symbol "AMPL."

10.     Amplitude's common stock price per share quickly experienced a significant increase in value following Defendant Skates' and Defendant Vuong's statements affirming the strength and likelihood of the Company's accelerated revenue growth. On September 28, 2021, on its first day of trading, the Company's common stock opening price per share was 40% above the established reference price of $35 per share, coming in at more than $50 per share.

---

[1] In contrast to a traditional IPO, direct listing IPOs do not set a definitive price of a company's stock, but rather allow already existing company shareholders to offload their shares at the highest prices the market will bear. For this reason, direct listing IPOs often do not generate much capital for companies but do allow their executives to personally profit from them.

11.     Over the next few months, the Company's stock price continued to soar, rising to $90 per share by the end of 2021. During this time, certain of the Individual Defendants sold over two million shares of their personal holdings of Amplitude common stock at artificially inflated prices for aggregate personal profits ***exceeding $116 million***. Defendant Skates alone sold more than $30 million worth of stock, while Defendant Vuong received more than $17 million for his insider sales, made at prices as high as almost $74 per share.

12.     The truth emerged on February 16, 2022, after the market closed, when Amplitude disclosed its fourth quarter of 2021 ("4Q21") financial results. That day, the Company filed a current report on Form 8-K with the SEC which included as an exhibit a press release issued by Amplitude announcing its 4Q21 financial results ("4Q21 Press Release"). The 4Q21 Press Release revealed that Amplitude significantly revised downwards its guidance for the fiscal year ending December 31, 2022 ("Fiscal Year 2022").

13.     That same day, on February 16, 2022, Amplitude held an earnings conference call (the "4Q21 Earnings Conference Call") to discuss the Company's 4Q21 financial results (the "4Q21 Financial Results"). During the 4Q21 Earnings Conference Call, Defendants Skates and Vuong revealed that Amplitude's land-and-expand strategy would "take a few years" before it led to accelerated growth and revenue results, directly contradicting their previous assurances that such acceleration was not only occurring but was currently sustainable. They went so far as to say that Amplitude "really [did not] know" when results would accelerate, thus revealing the true fragility of the Company's business prospects and overall sustainability of the Company's business model.

14.     On this news, the Company's common stock share price fell rapidly—from a closing price of $41.61 per share on February 16, 2022 to a closing price of $17.10 per share on February 17, 2022—representing a decrease of more than ***58%*** in value, or $24.51 per share.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make

false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the rapid revenue acceleration in the Company's 2Q21 financial results was driven by the short-term effects of the COVID-19 pandemic; (2) the positive effects the COVID-19 pandemic had on the Company's business had already subsided before the Company's September 2021 IPO as clients expanded at a reduced rate; (3) the Company's successful execution of the land-and-expand strategy was years away from accelerating revenues among new client cohorts; (4) as a result of the foregoing, the Company overstated its financial position and business prospects, including key metrics such as Fiscal Year 2022 guidance, revenue, and the successful execution of the land-and-expand strategy; and (5) the Company lacked adequate internal controls. Consequently, the Individual Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

17.     In further breach of their fiduciary duties, five of the Individual Defendants engaged in lucrative insider trading, attaining personal profits exceeding $116 million while the Company's stock price was artificially inflated as a result of the Individual Defendants causing the Company to issue materially false and misleading statements.

18.     In light of the Individual Defendants' misconduct—which has subjected Amplitude, its CEO, and its former CFO and principal financial officer to a securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and there not being disinterested and/or independent directors, a majority of Amplitude's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

22.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Amplitude is headquartered in this District.

Verified Shareholder Derivative Complaint

## PARTIES

**Plaintiff**

26.     Plaintiff is a current shareholder of Amplitude common stock. Plaintiff has continuously held Amplitude common stock at all relevant times.

**Nominal Defendant Amplitude**

27.     Amplitude is a Delaware corporation with principal executive offices at 201 Third Street, Suite 200, San Francisco, CA, 94103. Amplitude's Class A common stock trades on the NASDAQ under the ticker symbol "AMPL."

**Defendant Skates**

28.     Defendant Skates is a co-founder of Amplitude and has served as the Company's CEO and as Chairperson of the Board since 2011. According to the proxy statement on Schedule 14A the Company filed with the SEC on April 29, 2024 (the "2024 Proxy Statement"), as of April 10, 2024, Defendant Skates beneficially owned 8,200,340 shares of the Company's stock. As of that date, he beneficially owned 1,848,194 shares of Class A common stock and 6,352,146 shares of Class B common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024 was $10.32 per share, Defendant Skates owned approximately $19,073,362 worth of Amplitude Class A common stock as of that date. Defendant Skates' beneficial ownership of Class A and Class B common stock provides him with 13.1% control over the total voting power of the Company.

29.     . For Fiscal Year 2022, Defendant Skates received $450,000 in total compensation from the Company, consisting entirely of $450,000 in salary. For the fiscal year ending on December 31, 2021 ("Fiscal Year 2021"), Defendant Skates received $450,000 in total compensation from the Company, consisting entirely of $450,000 in salary.

30.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Skates made the following sales of Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| September 28, 2021 | 575,000 | $51.00 | $29,325,000 |
| October 1, 2021 | 25,000 | $54.23 | $1,355,700 |

Thus, in total, before the fraud was exposed, Defendant Skates sold 600,000 shares of Company Class A common stock on inside information, for which he received approximately $30,680,750 in proceeds. Defendant Skates' insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.     The 2024 Proxy Statement stated the following about Defendant Skates:

Spenser Skates is our co-founder and has served as our Chief Executive Officer and as a member of our Board since 2011. Mr. Skates previously worked as an algorithmic trader at DRW Trading Group, a diversified trading firm, from July 2010 to March 2011. He received a B.S. in Biological Engineering from the Massachusetts Institute of Technology ("MIT"). While at MIT, he won MIT's largest programming competition, Battlecode, in 2009 and 2010. We believe that Mr. Skates is qualified to serve on our Board due to the valuable expertise and perspective he brings in his capacity as our Chief Executive Officer and because of his extensive experience and knowledge of our industry.

**Defendant Vuong**

32.     Defendant Vuong served as the Company's CFO from April 2019 until February 22, 2023. During a portion of Fiscal Years 2022 and 2023, he also served as the Company's principal financial officer. He remained at Amplitude as an at-will employee through May 31, 2023.

33.     According to the 2024 Proxy Statement, as of April 10, 2024, Defendant Vuong beneficially owned 1,461,964 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024, was $10.32 per share, Defendant Vuong owned approximately $15,087,468 worth of Amplitude Class A common stock as of that date.

34.     For Fiscal Year 2022, Defendant Vuong received $6,824,339 in total compensation from the Company, consisting entirely of $550,000 in salary, $4,691,673 in stock awards, and $1,582,666 in option awards. For Fiscal Year 2021, Defendant Vuong received $550,000 in total compensation from the Company, consisting entirely of $550,000 in salary.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Vuong made the following sales of Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|

| September 28, 2021 | 200,000 | $52.00 | $10,400,000 |
| November 12, 2021 | 100,000 | $73.71 | $7,371,000 |

Thus, in total, before the fraud was exposed, Defendant Vuong sold 300,000 shares of Company Class A common stock on inside information, for which he received approximately $17,771,000 in proceeds. Defendant Vuong's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.   The proxy statement filed on Schedule 14A with the SEC on April 25, 2022 (the "2022 Proxy Statement") stated the following about Defendant Vuong:

> Hoang Vuong has served as our Chief Financial Officer since April 2019. He previously served as Chief Operating Officer and Chief Financial Officer at GoFundMe, Inc., a crowdfunding platform, from June 2015 to May 2019. From May 2012 to September 2014, Mr. Vuong held various leadership positions at Demandforce, Inc., an automated marketing and communications provider then owned by Intuit, Inc., a software company, most recently serving as Vice President and General Manager. He served as Chief Financial Officer at Demandforce prior to its acquisition by Intuit, from October 2011 to May 2012. Since October 2013, he has served on the Board of Directors of Revinate, Inc., a software company. Mr. Vuong received a B.S. in Accounting from the University of Southern California.

**Defendant Schultz**

37.   Defendant Schultz has served as a Company director since December 2020. She also serves as a member of the Nominating and Corporate Governance Committee ("Nominating Committee"). According to the 2024 Proxy Statement, as of April 10, 2024, Defendant Schultz beneficially owned 212,000 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024 was $10.32 per share, Defendant Schultz owned approximately $2,187,840 worth of Amplitude Class A common stock as of that date.

38.   For Fiscal Year 2022, Defendant Schultz received $34,000 in total compensation from the Company consisting entirely of $34,000 in fees earned or paid in cash. For Fiscal Year 2021, Defendant Schultz received $140,260 in total compensation from the Company consisting of $8,500 in fees earned or paid in cash and $131,760 in option awards.

39.   The 2024 Proxy Statement stated the following about Defendant Schultz:

Erica Schultz has served as a member of our Board since December 2020. Since October 2019, Ms. Schultz has served as President of Field Operations at Confluent, Inc., a publicly-traded data solutions provider. She also serves as a Limited Partner and Fund Advisor at Operator Collective, a venture capital fund that she joined in January 2019. Prior to joining Confluent, Ms. Schultz held various leadership positions at New Relic, Inc., a cloud-based software company, from June 2014 to October 2019, most recently serving as Chief Revenue Officer. She previously served as Executive Vice President of Global Sales, Services and Field Operations at LivePerson, Inc., a digital engagement company, from May 2013 to March 2014, after serving as Executive Vice President of Global Sales from February 2012 to May 2013. From November 1995 to January 2012, Ms. Schultz served in various roles at Oracle Corporation, a computing infrastructure and software company. She received a B.A. in Spanish and Latin American Studies from Dartmouth College, where she has served as a member of the Board of Trustees since June 2016. We believe that Ms. Schultz is qualified to serve on our Board due to her sales expertise and extensive management experience as a senior executive at enterprise technology companies.

**Defendant Grady**

40.    Defendant Grady has served as a Company director since November 2018. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 10, 2024, Defendant Grady beneficially owned 10,417,176 shares of Company's stock. As of that date, he beneficially owned 2,826,100 shares of Class A common stock and 7,591,076 shares of Class B common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024 was $10.32 per share, Defendant Grady owned approximately $29,165,352 worth of Amplitude Class A common stock as of that date. Defendant Grady's  beneficial ownership of Class A common stock provides him with 16% control over the total voting power of the Company.

41.    For Fiscal Year 2022 Defendant Grady received $179,968 in total compensation from the Company, consisting entirely of $179,968 in stock awards.

42.    The 2024 Proxy Statement stated the following about Defendant Grady:

Pat Grady has served as a member of our Board since November 2018. Mr. Grady is a Partner of Sequoia Capital, a technology-focused venture capital firm that he joined in March 2007. He also serves on the Boards of Directors of numerous privately-held technology companies, including Attentive Mobile, Inc., Cribl, Inc., Pilot.com, Inc, Watershed and Harvey. He previously served on the Boards of Directors of Okta, Inc., a publicly-traded identity and access management company, from May 2014 to June 2023, and Embark Trucks Inc., a publicly-traded autonomous trucking company, from May 2018 to August 2023, and on the Boards of Directors of numerous privately-held technology companies, including MarkLogic Corporation, Prosper Marketplace, Inc., and Namely, Inc.. Mr. Grady received a B.S. in Economics from Boston College. We believe

that Mr. Grady is qualified to serve on our Board due to his extensive experience in the venture capital industry and his knowledge of scaling technology companies.

**Defendant Liu**

43.     Defendant Liu has served as a Company director and as the Company's Chief Technology Officer ("CTO") since 2011. According to the 2024 Proxy Statement, as of April 10, 2024, Defendant Liu beneficially owned 8,094,719 shares of the Company's stock. As of that date, he beneficially owned 712,511 shares of Class A common stock and 7,382,208 shares of Class B common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024, was $10.32 per share, Defendant Liu owned approximately $7,353,113 worth of Amplitude Class A common stock as of that date. Defendant Liu's beneficial ownership of Class A common stock provides him with 14.7% control over the total voting power of the Company.

44.     For Fiscal Year 2022, Defendant Liu received $400,000 in total compensation from the Company, consisting entirely of $400,000 in salary. For Fiscal Year 2021, Defendant Liu received $400,000 in total compensation from the Company, consisting entirely of $400,000 in salary.

45.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Liu made the following sale of Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| September 28, 2021 | 300,772 | $50.42 | $15,164,924 |

Thus, in total, before the fraud was exposed, Defendant Liu sold 300,772 shares of Company Class A common stock on inside information, for which he received approximately $15,164,924 in proceeds. Defendant Liu's insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46.     The 2024 Proxy Statement stated the following about Defendant Liu:

Curtis Liu is our co-founder and has served as our Chief Technology Officer and as a member of our Board since 2011. Mr. Liu previously worked as a Software Engineer at Google LLC, a technology company, from August 2010 to August 2011. He received a B.S. in Electrical Engineering and Computer Science from MIT. While at MIT, he won MIT's largest programming competition, Battlecode, in 2010. We believe that Mr. Liu is qualified to serve on our Board due to his perspective, experience and leadership as our Chief Technology Officer.

**Defendant Wong**

47.     Defendant Wong has served as a Company director since June 2021. She also serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 10, 2024, Defendant Wong beneficially owned 55,085 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024 was $10.32 per share, Defendant Wong owned approximately $568,477 worth of Amplitude common stock as of that date.

48.     For Fiscal Year 2022, Defendant Wong received $37,000 in total compensation from the Company, consisting entirely of $37,000 in fees earned or paid in cash. For Fiscal Year 2021, Defendant Wong received $2,708,000 in total compensation from the Company, consisting entirely of $9,250 in fees earned or paid in cash and $2,698,750 in stock awards.

49.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wong made the following sales of Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 30, 2021 | 3,515 | $53.97 | $189,704 |
| November 23, 2023 | 3,515 | $66.01 | $232,025 |

Thus, in total, before the fraud was exposed, Defendant Wong sold 7,030 shares of Company Class A common stock on inside information, for which she received approximately $421,729 in proceeds. Defendant Wong's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

50.     The 2024 Proxy Statement stated the following about Defendant Wong:

Catherine Wong has served as a member of our Board since June 2021. Since March 2023, Ms. Wong has served as Chief Operating Officer and Chief Product Officer of Entrata, Inc., a property management software company. Prior to Entrata, Ms. Wong held various roles at Domo, Inc., a publicly-traded cloud-based business intelligence platform, serving as Chief Operating Officer and Executive Vice President, Engineering from November 2015 to January 2023, after serving as Chief Product Officer and Executive Vice President, Engineering from November 2015 to March 2022 and Senior Vice President, Engineering from September 2013 to November 2015. Ms. Wong continued to provide advisory services to Domo through March 2023. Prior to joining Domo, Ms. Wong was Vice President, Engineering at Adobe Inc., a software company,

from August 2009 to August 2013, and previously held various roles at Omniture, Inc., an online marketing and web analytics company, prior to experience acquisition by Adobe. She currently serves as a member of the Boards of Directors of Human Interest, Inc., an employee benefit plan provider, and the Women Tech Council. Ms. Wong received a B.S. in Computer Science from Brigham Young University. We believe that Ms. Wong is qualified to serve on our Board due to her extensive experience as a senior engineering executive at enterprise technology companies and her deep knowledge of our industry.

**Defendant Gill**

51.     Defendant Gill has served as a Company director since June 2019. He also serves as the Chairperson of the Audit Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 10, 2024, Defendant Gill beneficially owned 350,878 shares of the Company's stock. As of that date, he beneficially owned 40,878 shares of Class A common stock and 310,000 shares of Class B common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024 was $10.32 per share, Defendant Gill owned approximately $421,860 worth of Amplitude Class A common stock as of that date.

52.     For Fiscal Year 2022, Defendant Gill received $236,968 in total compensation from the Company, consisting of $57,000 in fees earned or paid in cash and $179,968 in stock awards. For Fiscal Year 2021, Defendant Gill received $14,250 in total compensation from the Company, consisting entirely of $14,250 in fees earned or paid in cash.

53.     The 2024 Proxy Statement stated the following about Defendant Gill:

Ron Gill has served as a member of our Board since June 2019. Mr. Gill has served as an Operating Partner of Lead Edge Capital, a growth equity investment firm, since June 2018. From August 2007 to March 2017, Mr. Gill held multiple financial leadership positions at NetSuite, Inc., a cloud computing company, most recently serving as Chief Financial Officer from July 2010 to March 2017, including through NetSuite's acquisition by Oracle in 2016. He previously held a variety of financial positions with several technology companies, including Hyperion Solutions, SAP SE, Dell Inc., and Sony Group Corporation. Mr. Gill has served on the Board of Directors of HubSpot, Inc., a publicly-traded customer relationship management software company, since June 2012. Mr. Gill received a B.A. in Finance and Economics from Baylor University and an M.I.B. in International Business from the University of South Carolina. We believe that Mr. Gill is qualified to serve on our Board due to his extensive experience as a senior executive at public technology companies and his deep financial expertise.

**Defendant Steele**

54. Defendant Steele has served as a Company director since March 2021. She also serves as a member of the Audit Committee and as the Chairperson of the Nominating Committee. According to the 2024 Proxy Statement, as of April 10, 2024, Defendant Steele beneficially owned 214,796 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024, was $10.32 per share, Defendant Steele owned approximately $2,216,694 worth of Amplitude Class A common stock as of that date.

55. For Fiscal Year 2022, Defendant Steele received $43,395 in total compensation from the Company, consisting entirely of $43,395 in stock awards. For Fiscal Year 2021, Defendant Steele received $785,420 in total compensation from the Company, consisting of $9,500 in fees earned or paid in cash and $775,920 in stock awards.

56. The 2024 Proxy Statement stated the following about Defendant Steele:

Elisa Steele has served as a member of our Board since March 2021. Ms. Steele previously served as Chief Executive Officer of Namely, Inc., a human resources software company, from August 2018 to July 2019, and as a member of the Board of Directors of Namely from August 2017 to September 2022, including as Chairperson of the Board from July 2019 to September 2022. From January 2014 to July 2017, Ms. Steele held various leadership positions at Jive Software, Inc., a collaboration software company acquired by Aurea Software, Inc., most recently serving as Chief Executive Officer and President. Ms. Steele has also previously held executive leadership positions at Microsoft Corporation, Skype Inc., Yahoo! Inc., and NetApp, Inc. She currently serves on the Boards of Directors of multiple publicly-traded technology companies, including Bumble Inc., since July 2020, JFrog Ltd., since March 2020, and Procore Technologies, Inc., since February 2020. Ms. Steele previously served as chair of the Board of Directors of Cornerstone OnDemand, Inc., a publicly-traded human capital management software company, from June 2018 to June 2021 and as a member of the Boards of Directors of Splunk, Inc., then a publicly-traded technology company, from September 2017 until Splunk was acquired by Cisco in March 2024, and Jive Software from February 2015 to June 2017. Ms. Steele received a B.S. in Business Administration from the University of New Hampshire and an M.B.A. from San Francisco State University. We believe that Ms. Steele is qualified to serve on our Board due to her marketing expertise and her extensive experience as a public and private company chief executive officer and as a board member of publicly-traded technology companies.

**Defendant Vishria**

57. Defendant Vishria has served as a Company director since December 2014. He also serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of

April 10, 2024, Defendant Vishria beneficially owned 3,024,089 shares of the Company's stock. As of that date, he beneficially owned 339,081 shares of Class A common stock and 2,685,008 shares of Class B common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024 was $10.32 per share, Defendant Vishria owned approximately $3,499,315 worth of Amplitude Class A common stock as of that date.

58.     For Fiscal Year 2022, Defendant Vishria received $179,968 in total compensation from the Company, consisting entirely of stock awards.

59.     The 2024 Proxy Statement stated the following about Defendant Vishria:

Eric Vishria has served as a member of our Board since December 2014. Since July 2014, Mr. Vishria has served as a General Partner of Benchmark Capital, a venture capital firm, where he focuses on early-stage infrastructure and enterprise software investments. From August 2013 to August 2014, Mr. Vishria was Vice President, Digital Magazines and Verticals at Yahoo! Inc., a web services provider. He currently serves on the Board of Directors of Confluent, Inc., a publicly-traded data solutions company, and on the Boards of Directors of numerous privately-held technology companies, including AcuityMD, Inc., Airplane Labs, Inc., Benchling, Inc., Cerebras Inc., Commerce Layer, Inc. and Contentful Global, Inc. He received a B.S. in Mathematical and Computational Science from Stanford University. We believe that Mr. Vishria is qualified to serve on our Board due to his extensive operational and marketing expertise and his service as a board member of other technology companies.

60.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Vishria made the following sales of Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 28, 2021 | 1,000,000 | $52.49 | $52,490,000 |

Thus, in total, before the fraud was exposed, Defendant Vishria sold 1,000,000 shares of Company Class A common stock on inside information, for which he received approximately $52,490,000 in proceeds. Defendant Vishria's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Whitehurst**

61.     Defendant Whitehurst has served as a Company director since September 2021. He also serves as the Chairperson of the Compensation Committee. According to the 2024 Proxy Statement, as

of April 10, 2024, Defendant Whitehurst beneficially owned 89,481 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at the close of trading on April 10, 2024 was $10.32 per share, Defendant Whitehurst owned approximately $923,443 worth of Amplitude Class A common stock as of that date.

62.      For Fiscal Year 2022, Defendant Whitehurst received $55,271 in total compensation from the Company, consisting entirely of $55,271 in stock awards. For Fiscal Year 2021, Defendant Whitehurst received $4,820,500 in total compensation from the Company, consisting of $13,000 in fees earned or paid in cash and $4,807,500 in stock awards.

63.      The 2024 Proxy Statement states the following about Defendant Whitehurst:

James Whitehurst has served as a member of our Board since September 2021. Mr. Whitehurst has served as interim Chief Executive Officer and President, and as a member of the Board of Directors, of Unity Software Inc., a publicly-traded software development company, since October 2023. He has also served as a Special Advisor at Silver Lake Partners, a technology investment firm, since March 2021. He previously served as a Senior Advisor at International Business Machines Corporation ("IBM"), a global technology company, from July 2021 to May 2022, after serving as President from April 2020 to July 2021 and as Senior Vice President from July 2019 to April 2020. From January 2008 to April 2020, he served as Chief Executive Officer of Red Hat, Inc., an open source software company, including through Red Hat's acquisition by IBM in July 2019. Prior to joining Red Hat, Mr. Whitehurst held various leadership positions at Delta Air Lines, Inc., a global airline operator, from January 2002 to August 2007, and Boston Consulting Group, a management consulting firm, from September 1989 to December 2001. Mr. Whitehurst has served on the Boards of Directors of United Airlines Holdings, Inc., a publicly-traded global airline operator, since March 2016, Tanium Inc., a privately-held cybersecurity and systems management company, since January 2022, and Software AG, a software company traded on a foreign stock exchange, since January 2023. Mr. Whitehurst previously served on the Boards of Directors of multiple publicly-traded companies, including Red Hat, from January 2008 to July 2019, SecureWorks Corp., a cybersecurity company, from April 2016 to April 2019, and DigitalGlobe, Inc., a builder and operator of satellites for digital imaging, from August 2009 to May 2016. Mr. Whitehurst received a B.A. in Computer Science and Economics from Rice University and an M.B.A. from Harvard Business School. We believe that Mr. Whitehurst is qualified to serve on our Board due to his extensive operational and management expertise and his experience as a public company chief executive officer and as a board member of publicly-traded technology companies.

**Defendant Agrawal**

64.      Defendant Agrawal served as a Company director from June 2016 until June 2022. He also served on the Audit Committee.

65.     The Offering Documents stated the following about Defendant Agrawal:

Neeraj Agrawal has served as a member of our board of directors since June 2016. Mr. Agrawal is a General Partner of Battery Ventures, a technology-focused investment firm that he joined in August 2000. He serves on the boards of directors of numerous privately-held technology companies, including Braze, Inc., Catchpoint Systems, Inc., Clubhouse Software Inc., Dataiku Inc., Kustomer, Inc., LogRocket, Inc., Pendo.io, Inc., Reify Health, Inc., Repeat, Inc., Sprinklr, Inc., Tealium Inc., Thundra, Inc., Workato, Inc., Wunderkind Corporation (formerly BounceX) and Yesware, Inc. He previously served on the boards of directors of multiple publicly-held companies, including Coupa Software, Inc., a software company, from January 2014 to February 2018, Wayfair Inc., a furniture and home goods e-commerce company, from June 2011 to January 2018, and Marketo, Inc., a software company, from November 2011 to June 2016. Mr. Agrawal received a B.S. in Computer Science from Cornell University and an M.B.A. from Harvard Business School. We believe that Mr. Agrawal is qualified to serve on our board of directors due to his extensive experience in the venture capital industry and his service as a board member of other technology companies

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

66.     By reason of their positions as officers, directors, and/or fiduciaries of Amplitude and because of their ability to control the business and corporate affairs of Amplitude, the Individual Defendants owed Amplitude and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Amplitude in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Amplitude and its shareholders so as to benefit all shareholders equally.

67.     Each director and officer of the Company owes to Amplitude and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Amplitude, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69.     To discharge their duties, the controlling shareholders, officers and directors of Amplitude were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Amplitude, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Amplitude's Board at all relevant times.

71.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and directors of Amplitude were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Amplitude were required to, among other things:

    (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Amplitude's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Amplitude conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Amplitude and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Amplitude's operations would comply with all applicable laws and Amplitude's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.    Each of the Individual Defendants further owed to Amplitude and the shareholders the duty of loyalty requiring that each favor Amplitude's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Amplitude and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Amplitude, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Amplitude.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, and waste of corporate assets.

79.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Amplitude was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Amplitude and was at all times acting within the course and scope of such agency.

## AMPLITUDE'S CODE OF BUSINESS CONDUCT AND ETHICS

82.     The Code of Conduct applies to all Amplitude employees, including "directors, officers and other employees." The "Introduction" to the Code of Conduct states the following, in relevant part:

> This Code of Business Conduct and Ethics (this "Code") contains general guidelines for conducting the business of Amplitude, Inc. (the "Company") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, we adhere to these higher standards.

83.     In a section titled "Reporting Violations of the Code," the Code of Conduct states the following, in relevant part:

> All employees, consultants and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or believe there has been a violation of this Code, immediately report the conduct to your supervisor or the Compliance Officer. The Compliance Officer will work with you and your supervisor or other appropriate persons to investigate your concern. If you do not feel comfortable reporting the conduct to your supervisor or you do not get a satisfactory response, you may contact the Compliance Officer directly.

84.     Additionally, in a section titled "Waivers of the Code," the Code of Conduct states the following:

> Any waiver of this Code for our directors, executive officers or other principal financial officers may be made only by the Board and will be disclosed to the public as required by law or the rules of the Nasdaq Stock Market LLC. Waivers of this Code for other employees or consultants may be made only by the Compliance Officer and will be reported to the Company's Audit Committee.

85.     In another section titled "Conflict of Interest," the Code of Conduct states, in relevant

part:

> A conflict of interest can occur when an employee's, consultant's or director's private interest interferes, or appears to interfere, with the interests of the Company as a whole. For example, a conflict of interest can arise when an employee, consultant or director takes actions or has personal interests that may make it difficult to perform such person's Company duties objectively and effectively.
>
> Conflicts of interest can also occur indirectly. For example, a conflict of interest may arise ***when an employee, consultant or director is also an executive officer***, a major shareholder or has a material interest in a company or organization doing business with the Company.
>
> Each employee, consultant and director has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.
>
> (Emphasis Added.)

86.     Under the heading "Confidential Information," the Code of Conduct states, in relevant part:

> Employees, consultants and directors have access to a variety of confidential information regarding the Company. Confidential information includes all non-public information that might be of use to competitors, or, if disclosed, harmful to the Company or its customers. Employees, consultants and directors have a duty to safeguard all confidential information of the Company or third parties with which the Company conducts business, except when disclosure is authorized or legally mandated.

87.     In another section titled "Protection and Proper Use of Company Assets," the Code of Conduct states: "All employees, consultants and directors should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's financial results. All Company assets should be used for legitimate business purposes."

88.     In a section titled "Company Records," the Code of Conduct makes it clear that "[a]ccurate and reliable records are crucial to our business." The Code of Conduct further goes on to state, "[a]ll Company records must be complete, accurate and reliable in all material respects. Each employee, consultant and director must follow any formal document retention policy of the Company with respect to Company records within such employee's, consultant's or director's control."

89.     Additionally, in a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's Chief Financial Officer and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

90.     Further, under the heading "Compliance With Laws and Regulations," the Code of Conduct states in relevant part,

Each employee, consultant and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets.

88.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. Moreover, Defendants Liu, Wong, Skates, Vuong, and Vishria violated the Code of Conduct by engaging in lucrative insider trading. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

***Amplitude's Audit Committee Charter***

89.     The Amplitude Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

90.     Per the "Purpose" section of the Audit Committee Charter, the Audit Committee is tasked with overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. The Audit Committee Charter states, in relevant part:

The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements. Each member of the Committee is entitled to rely on the integrity of those persons within the Company and from the professionals and experts from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

91.    Under the section titled, "Duties and Responsibilities," the Audit Committee Charter states that the Audit Committee's duties and responsibilities are as follows regarding:

***Interaction with the Independent Auditor***

- *Appointment and Oversight*. The Committee is directly responsible for the appointment, engagement, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm shall report directly to the Committee. The Committee, or the Chair of the Committee, shall pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

- *Annual Report on Independence*. The Committee shall ensure that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Company, shall actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditor, and, if the Committee 3 determines that further inquiry is advisable, shall take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence. The Committee shall also assure the regular rotation of the audit partners (including, without limitation, the lead and concurring partners) as required under the Exchange Act and Regulation S-X.

- *Review of Written Communications*. The Committee may review all material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences. The Committee shall review and discuss with the independent auditors any report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

1

### *Annual Financial Statements and Annual Audit*

2

3
- *Audit Problems*. The Committee should discuss with the independent auditor any audit problems or difficulties and management's response.

4

5

6

7
- *Form 10-K Review*. The Committee shall review and discuss the annual audited financial statements with management and the independent auditor, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

8

9

10
- *Audit Committee Report*. The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

11

### *Quarterly Financial Statements*

12

13

14
- *Form 10-Q Review*. The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

15

### *Other Duties and Responsibilities*

16

17
- *Review of Earnings Releases*. The Committee should review the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

18

19

20
- *Risk Assessment and Risk Management*. The Committee should periodically review and discuss with management the Company's policies with respect to risk assessment and risk management, including major financial and cybersecurity risks.

21

22

23
- *Hiring of Independent Auditor Employees*. The Committee may establish hiring policies for employees or former employees of the Company's independent auditor.

24

25
- *Review of Related Party Transactions*. The Committee has responsibility to review and, as applicable, approve all related party transactions as defined by Item 404 of Regulation S-K on an ongoing basis.

26

27
- *Complaint Procedures*. The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the

28

confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

- *Reports to the Board of Directors*. The Committee should report regularly to the Board regarding the activities of the Committee.

- *Committee Self-Evaluation*. The Committee should, at least annually, perform an evaluation of the performance of the Committee.

- *Review of this Charter*. The Committee shall annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

92.     Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93.     Amplitude offers "digital optimization" through a data analytics software platform that assists businesses in understanding customer behavior through monitoring customer interactions. Such insight allows businesses to determine which applications or features are more popular than others amongst customers, giving businesses the opportunity to rework their products to maximize user engagement, profitability, and more.

94.     Amplitude offers three products: (1) Amplitude Analytics; (2) Amplitude Recommend; and (3) Amplitude Experiment. Amplitude Analytics is the main product offering, consisting of product-analytics tools used to provide teams with fast self-service insights into customer behavior. Amplitude Recommend serves as a no-code personalization solution that helps teams increase customer engagement by adapting digital products and campaigns to every user based on behavior. Amplitude

Experiment is an integrated end-to-end experimentation solution that enables teams to determine and deliver the most impactful product experience for their customers.

96.     Amplitude's revenue mainly stems from subscription sales. The Company reaches customers through direct customer engagement, solutions partners who assess the clients' business needs, challenges and goals, and product-led growth initiatives.

97.     Prior to the Relevant Period, Amplitude's revenues soared, but the Company remained unprofitable, nonetheless. For the first half of Fiscal Year 2021, the Company's losses were $100,000 less than the Company's losses for the first half of the prior fiscal year. Indeed, the Company's losses for the first half of Fiscal Year 2021 were $16,500,000 while the Company's losses for the same period the prior fiscal year were $16,600,000. The absence of profit made continued revenue acceleration essential to the Company's financial success. The Individual Defendants assured the investing public that revenue growth seen in the first half of Fiscal Year 2021 would continue to accelerate, and specifically cited to the Company's 57% revenue growth spurt during the first half of the 2020 fiscal year, when revenue skyrocketed from $46 million to $72 million. To this end, for the remaining months of Fiscal Year 2021, the Individual Defendants made staggering revenue projections, representing that Amplitude's revenue would be between $160 million and $162 million—a projection of 57% year-over-year revenue growth at the midpoint.

### **False and Misleading Statements**

#### ***September 21, 2021 2Q21 Press Release***

98.     Immediately following Amplitude's direct listing IPO on September 28, 2021, Amplitude issued a press release reporting its 2Q21 financial results ("2Q21 Press Release"). In the 2Q21 Press Release, Defendants Skates and Vuong touted the Company's financial growth, highlighting Amplitude's 66% quarterly revenue growth, 76% cRPO growth, and a 119% NRR. Further, the Company indicated in the 2Q21 Press Release that it anticipated Fiscal Year 2022 total revenue growth to be high, stating, "the Company expects that its full year 2022 total revenue growth will be in excess of 40%." Defendant Skates made the following statement included in the 2Q21 Press Release:

The acceleration of the digital world has put digital products at the center of business. Digital products are driving how businesses operate, go to market and generate revenue . . . . As organizations make the shift to product-led growth, they are turning to Amplitude to help drive business outcomes. ***Great execution combined with strong demand for the Amplitude Digital Optimization System has led to our exceptional second quarter results***, highlighted by revenue growth of 66% year-over-year, and a strong outlook for the year. ***We believe we are in the very early stages of a large opportunity*** and that we can help companies of various sizes and digital maturities build great products through data.

(Emphasis added.)

### September 21, 2021 Earnings Call

99.    The Company held its 2Q21 Earnings Call on September 21, 2021. During the 2Q21 Earnings Call, Defendants Skates and Vuong attributed the Company's financial success in its second quarter to the up-and-coming prominence of digital analytics, effective execution of the land-and expand strategy, and the expansion from existing customers who are increasing their usage of Amplitude's services. Specifically, Defendant Skates stated that "Amplitude had an outstanding second quarter, reflecting the rapid acceleration of the digital world and great execution by our team." Defendant Skates then went on to say, "Marketing, product, data science and vendor teams increased their Amplitude usage and event volume substantially over this time frame, including a volume-based upsell in Q2."

100.    Additionally, during the 2Q21 Earnings Call, Defendant Vuong represented the expansion from existing customers as reliable and further represented that "Expansion from existing customers were particularly robust as the team continued to execute well on our land-and-expand strategy." As the 2Q21 Earnings Call continued, the Company's investor relations representative inquired into the viability of revenue growth acceleration. Specifically, the representative asked, "What are some of the assumptions that you've built into your guidance given the acceleration you saw in Q2? And is that sustainable?" and Defendant Vuong replied, "***Yes***."

101.    When asked what was driving the Company's customer expansion, Defendant Vuong explained that it was "coming from multiple angle[s]," stating in relevant part:

As far as some of the primary driver for driving expansion, we're really excited by the fact that, when we look at Q2, ***we saw expansion coming from multiple angle[s]. We saw folks that are just expanding purely because of their expanding from volume***. As Spenser highlighted, ***we also saw a few customers added Recommend and Experiment***. Now I want to be careful that those are still relatively new and still relatively small, but

it's really an encouraging sign to see. And then *we also saw other customers really adding and expanding it into other product lines and business units*. And so there wasn't one massive thing or another. *It actually kind of came pretty healthy in terms of the larger expansion coming from [either just] volume or people expanding into additional product lines*.

(Emphasis added.)

### The Offering Documents

102.     The Company filed the Prospectus for the IPO on Form 424B4 on September 28, 2021, which forms part of the Offering Documents signed by Defendants Skates, Vuong, Agrawal, Gill, Grady, Liu, Schultz, Steele, Vishria, and Wong. The Offering Documents represented that Amplitude's land-and-expand strategy was one of its main "Growth Strategies." The Offering Documents stated in relevant part:

> • *Expand Across Our Existing Customer Base.* We believe that there are significant opportunities to continue to expand our relationships with our existing customers. We employ a land and expand business model designed to land with an initial use case and expand through onboarding additional functional teams, products, and use cases.
>
> ○ *Promote Upsell: Once a customer is on our platform there are many ways we can promote upsell opportunities.* Customers can expand an initial use case by adding additional events or functionality to generate deeper analytics. They can also expand into additional functional teams who are looking to address a related use case or bring new digital products on our platform, both of which require additional data to be instrumented.
>
> ○ *Drive Cross-sell*: *Our platform delivers end-to-end optimization that allows our customers to expand beyond analytics and layer on additional products, such as Recommend and Experiment, and we offer to optimize the digital product experiences of their customers.*
>
> *Within our largest customers, we have demonstrated our ability to grow our reach to include thousands of users across their organization who leverage our system to drive business outcomes. Our dollar-based net retention rate as of December 31, 2020 and June 30, 2021 was 119% for paying customers.*

(Emphasis added in second, third, and fourth paragraphs.)

103.     The Offering Documents depicted the land-and-expand strategy as a plan of action that was already reaping benefits for the Company. The Offering Documents purported that Amplitude customers "frequently expand" after being onboarded to Amplitude products and that the strategy's efficacy had already been "demonstrated" by the Company's existing NRR, stating in relevant part:

1

2

3

4

*As customers experience the value of our platform in helping to drive business outcomes in that initial use case, they frequently expand that initial use case, expand into new use cases, and expand into additional products. Our ability to expand successfully within our customer base is demonstrated by our strong dollar-based net retention rates*. As of December 31, 2019 and 2020, our dollar-based net retention rate across paying customers was 116% and 119%, respectively.

5

6

(Emphasis added.)

7

104.    Further, the Offering Documents highlighted the increased need for digital optimization

8

platforms stating that "*digital optimization will be needed to make sense of the exponential increase in

9

digital product and user behavioral data to help ensure businesses are making the right product bets

10

and maximizing their impact*." (Emphasis added.) Additionally, it claimed that the Company's digital

11

optimization products would "*be a strategic business imperative as digital transformation continues at

12

an accelerated pace*." (Emphasis added.) The Offering Documents also emphasized the high value of

13

the digital optimization market ($37 billion market at the time) and presented Amplitude's market leader

14

position in the digital analytics space as a key "competitive strength" of the Company.

15

***September 29, 2021 Online Ask Me Anything Session with Defendant Skates***

16

105.    Amplitude hosted an online Ask Me Anything session ("AMA Session") on September

17

29, 2021. During the AMA Session, Defendant Skates was asked why he took the Company public.

18

Defendant Skates' response touted Amplitude's ability to conduct proper financial and legal oversight

19

and efficiently plan its business, stating, in pertinent part:

20

21

22

23

You really should take your company public once you reach 100M in ARR. The expectation for performance across the board goes up and good companies rise to meet the moment. *You're expected to do a better job of forecasting and planning your business, telling your story, sharing your long term vision, ensuring proper financial and legal oversight, and a lot else*. Companies staying private so much longer has been bad for them and for the ecosystem IMO.

24

(Emphasis added.)

25

106.    Later in the AMA Session, Defendant Skates explained the strategy behind conducting

26

the IPO via direct listing, as opposed to a traditional IPO process. He stated that a traditional IPO "sets

27

you up to massively underprice your stock" and that he believed "companies that went through the

28

traditional IPO process underpriced their stock by 50%," indicating that Amplitude's direct listing stock price, which opened at $50 per share, represented the true value of the Company.

107.    Defendant Skates went on to describe his logic in conducting the IPO via a direct listing, as well as his expectation that the stock price would increase, stating that:

> My absolute favorite argument was that if you price too high, you price out people who will stick with you, and that will cause your price to be lower in the future than it would have been otherwise. Luckily, I did a year in the finance world in high frequency trading so they couldn't pull this one on me. That logic is the opposite of how pricing in a market works. ***High prices now are a signal that prices in the future are expected to be higher. If you want your price to be higher in the future, having it be higher in the present will increase the likelihood of that outcome***. The thinking reminded me of Yogi Berra's famous quote: "Nobody goes there anymore. It's too crowded."

(Emphasis added.)

108.    Later in the AMA Session, Defendant Skates was asked to describe what direction he saw the Company moving in now that it was public. In response, he pointed to the Company's soaring revenue growth and success, stating, in pertinent part:

> I feel good about the massive market as well as our differentiation. The #1 challenge is getting the right team in place to execute successfully against the opportunity. ***When you're growing 50-60% YoY***, you have an entirely new company every 2 years. There is such a high degree of variation between people that just because you're a high functioning organization today does not guarantee you will be tomorrow. My biggest lever on it as CEO is the leaders we bring into the business and so I spend a lot of time thinking about how to get that right.

(Emphasis added.)

***November 9, 2021 3Q21 Press Release***

109.    The Company issued a press release on November 9, 2021, announcing its 3Q21 financial results ("3Q21 Press Release"). The 3Q21 Press Release emphasized positive financial results, including 72% quarterly revenue growth, 66% cRPO growth, and a 121% NRR. The 3Q21 Press Release also included a quote by Defendant Skates' stating that the Company's third quarter results were driven by "Good execution combined with strong demand for the Amplitude Digital Optimization System." He then went on to say, "We are in the very early stages of a large market opportunity…"

***November 9, 2021 3Q21 Earnings Call***

110.     Later that same day, Amplitude held an earnings conference call to discuss the Company's 3Q21 financial results ("3Q21 Earnings Call"). The 3Q21 Earnings Call was led by Defendants Skates and Vuong. During 3Q21 Earnings Call, Defendant Skates emphasized the strength of customer demand for Amplitude's digital analytics platform stating, "Existing customer demand for Amplitude was also strong, with expanding customer usage and solid traction with our new products, Recommend and Experiment." He went on to say, "This was further demonstrated by a dollar-based net retention rate of 121%, which improved 200 basis points year-on-year" and that "We're also seeing the power of Amplitude's digital optimization system help with customers' critical business goals and enable them to become more product-led."

111.     Throughout the 3Q21 Earnings Call, Defendant Skates emphasized the importance of the Company's digital optimization system, stating "[the digital optimization system] leads to more expansion and upsells within existing accounts and increasing customer adoption with our new products." Defendant Skates then mentioned several examples of the Company's apparent success with upselling clients and utilizing their land-and-expand strategy.

112.     During the 3Q21 Earnings Call, Defendant Vuong first mentioned the impact of the COVID-19 pandemic on the Company's financial success stating, "we had some large expansion in Q2 '21 along with easier year-over-year comp due to the impact of COVID that are contributing to our growth rate" and claimed that Amplitude "ended Q3 '21 with 1,417 paying customers" mentioning that this was "an increase of 54% year-over-year versus 51% last quarter, continuing the acceleration of customer growth." Defendant Vuong then assured those listening in that the Company's success was not solely based on the pandemic stating, "***Overall, our team continues to execute well on our land-and-expand strategy***, improving our dollar-based Net Retention Rate, or our NRR, to 121% and up 200 basis points both sequentially and year-over-year." (Emphasis added.)

113.     In response to an analyst's question about Amplitude's cross-sell opportunities, Defendant Vuong assured the investing public that the Company was successfully pursuing various initiatives in its land-and-expand strategy, stating in relevant part:

*I think as we look at the kind of medium-, long-term, we see opportunity to grow net retention rate, not just from [extension], as you mentioned, with both volume up-sell, but what we consider a horizontal upsell, where you're selling to different use cases or additional business unit and product line inside of the company. And then, obviously, the addition of Recommend and Experiment, as you just mentioned, that just gives us additional firepower to go after our existing base.*

*And so the combination of those strengths that we're seeing, along with we mentioned in Q2 we had some really great expansion*, and then coming off of some quarters that had, let's say, more churn coming from SMB and other from COVID is why we're seeing the increase in that retention rate. And our goal is to try to maintain that and keep that well above $120 million.

(Emphasis added.)

114.   Defendant Vuong went on to discuss the Company's sales and marketing efforts stating, "I think we feel really great about, first, [getting] the story that we're able to tell both in the market and the customers and the success that we're actually having in terms of winning new customer and expanding customers."

115.   The statements referenced in ¶¶ 98-114 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the rapid revenue acceleration in the Company's 2Q21 financial results was driven by the short-term effects of the COVID-19 pandemic; (2) the positive effects the COVID-19 pandemic had on the Company's business had already subsided before the Company's September 2021 IPO as clients expanded at a reduced rate; (3) the Company's successful execution of the land-and-expand strategy was years away from accelerating revenues among new client cohorts; (4) as a result of the foregoing, the Company overstated its financial position and business prospects, including key metrics such as Fiscal Year 2022 guidance, revenue, and the successful execution of the land-and-expand strategy; and (5) the Company lacked adequate internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**THE TRUTH EMERGES**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

116.    After the market closed on February 16, 2022, Amplitude announced its 4Q21 Financial Results in the 4Q21 Press Release. In the 4Q21 Press Release, the Company revised downward its Fiscal Year 2022 revenue guidance from more than 40% to a range of $226 million to $234 million (or 35% to 40%).

117.    That same day, Amplitude hosted its 4Q21 earnings call ("4Q21 Earnings Call"). The 4Q21 Earnings Call was led by Defendant Vuong and Defendant Skates. During the 4Q21 Earnings Call, Defendant Vuong revealed, for the first time, that the Company's digital optimization platform would take "a few years" before many of its new customers "completely embrac[ed] the full capability of [Amplitude's] digital optimization," which he stated would ultimately "drive larger expansion." Defendant Vuong then went on to say that "The precise timing of these can fluctuate and that timing uncertainty is reflected in our 2022 guidance." This cut directly against Defendant Vuong and Skates' previous statements that remarkable expansions were already occurring at a "frequent" pace.

118.    Defendant Vuong also revealed why the Company's expansion had suddenly slowed down stating that the Amplitude's previous revenue acceleration was a short-term effect of the COVID-19 pandemic. Specifically, he stated ""[w]e obviously expected that growth rate to kind of slow down or decline." He then went on to explain that the exact timing of expansion efforts was unclear stating, "it's just not clear for us right now in terms of the exact timing of these expansions," while noting that the Company was making progress at a "slower" rate than before.

119.    Analysts immediately began asking Defendant Skates and Vuong why Amplitude's customers "were really not expanding where you expected?" and whether Amplitude needed "to rectify that from a product perspective?" or change course in some other way, following these unforeseen admissions. In his response, Defendant Skates stressed the tendency of expansions to fluctuate and later stated that "it's not just a one quarter or one year thing. It can take many years even in these companies that are very tech forward because they're adopting a new way of building their product." One analyst in particular asked Defendant Skates how it was possible that the Company was suddenly switching gears by saying "we don't know when the expansion is going to happen" to which Defendant Skates responded, in relevant part:

As to the timing comment, I think this is something, frankly, I've seen as CEO since the very beginning of Amplitude. Like you come in, you land with a team and they'll start to get some wins and then that religion will grow and get adopted by the rest of the company. *But that process, it can take a few years. It's not just like a one-quarter thing where it's like, all right, let's roll this whole thing out from day one*.

(Emphasis added.)

120.    In response to the truth about how long it would actually take for the land-and-expand strategy to accelerate revenue growth with the Company's new clients came to light, as well as the revelation that the true basis for the Company's accelerated revenue growth during 2Q21 was due to the short-term effects of the COVID-19 pandemic, Amplitude's stock quickly plunged downward.

121.    On this news, the Company's common stock share price fell rapidly—from a closing price of $41.61 per share on February 16, 2022 to a closing price of $17.10 per share on February 17, 2022—representing a decrease of more than *58%* in value, or $24.51 per share.

122.    On July 26, 2023, the Company issued a press release announcing its preliminary unaudited financial results for the second quarter of 2023. In it, the Company announced it was revising its guidance for the Fiscal Year 2023.

123.    Analysts quickly reacted to the Defendant Vuong and Stakes' admissions, making considerable cuts on their price targets for the Company's stock. One of the first was Morgan Stanley, who cut its price target *more than 50%* from $70 per share to $34 per share on February 17, 2022. When lowering the price target, Morgan Stanley noted that "Amplitude's second quarter as a public company fell short of expectations" because of customers "expanding spend at a slower rate." It went on to foreshadow the future price of shares stating, "[w]e expect shares to be under pressure until we see evidence of faster execution against the emerging Digital Optimizing software opportunity, supporting upside to guidance and limiting the growth deceleration into FY22 (+37.5% from +63.2% in FY21)."

124.    That same day, on February 17, 2022, BofA Global Research lowered its Amplitude price target nearly 50% from $65 per share to $38 per share. It stated that the following, in pertinent part:

[the Company's] 2022 revenue guidance that came in below the Street, and management's commentary on the puts and takes raises several questions on: 1) the stability of the future growth profile, 2) the magnitude of pandemic pull-forward tailwinds turning into headwinds, 3) visibility into the pipeline and end-market demand trends, 4) overall competitive environment, and 5) execution risks.

## DAMAGES TO AMPLITUDE

125.   As a direct and proximate result of the Individual Defendants' conduct, Amplitude has lost and expended, and will continue to lose and expend, many millions of dollars.

126.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

130.   As a direct and proximate result of the Individual Defendants' conduct, Amplitude has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

131.   Plaintiff brings this action derivatively and for the benefit of Amplitude to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Amplitude, waste of corporate assets,

unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act, as well as the aiding and abetting thereof.

132.    Amplitude is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Amplitude. Plaintiff will adequately and fairly represent the interests of Amplitude in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

134.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

135.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consisted of Defendants Skates, Schultz, Grady, Liu, Wong, Gill, Steele, Vishra, and Whitehurst (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants that were on the Board at the time this action was commenced.

136.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

137.    Additional reasons that demand on Defendant Skates is futile follow. Defendant Skates has served as the CEO, President, and Chairperson of the Board since 2011. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Skates with his principal occupation for which he is handsomely paid, including at least $900,000 during the Relevant Period. As CEO, Defendant Skates is ultimately responsible for all, and personally made many, of the false and misleading statements and omissions that were made, including: (1) the  2Q21 Press Release; (2) the

2Q21 Earnings Call; (3) the Offering Documents which he personally signed; (4) the 2021 AMA Session; (5) the 3Q21 Press Release; and (6) the 3Q21 Earnings Call. As the Company's top executive officer and trusted Chairperson of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Skates is a defendant in the Securities Class Action. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $30.7 million. For these reasons, too, Defendant Skates breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.   Additional reasons that demand on Defendant Schultz is futile follow. Defendant Schultz has served as a Company director since 2020. As a member of the Board, she serves on the Nominating Committee. Defendant Schultz personally signed the Offering Documents, which contained materially false and misleading statements made in connection with the IPO. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Schultz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.   Additional reasons that demand on Defendant Grady is futile follow. Defendant Grady has served as a Company director since 2018. As a member of the Board, he serves on the Audit Committee. The Company also provides Defendant Grady with handsome compensation, including at least $179,968 in Fiscal Year 2022 alone. Moreover, Defendant Grady personally signed the Offering Documents, which contained materially false and misleading statements made in connection with the IPO. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to protect corporate assets. Additionally, as a member of the Audit Committee he was obligated to ensure that the

Company's internal controls were functional and that its financial statements were fair and accurate. For these reasons, Defendant Grady breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and, therefore, excused.

140. Additional reasons that demand on Defendant Liu is futile follow. Defendant Liu has served as a Company director and as CTO since 2011. Thus, as the Company admits, Defendant Liu is not an independent director. Defendant Liu also engaged in lucrative insider trading during the Relevant Period while the Company's stock price was artificially inflated, obtaining personal profits of approximately $15.2 million. The Company also provides Defendant Liu with his principal occupation of CTO for which he is handsomely paid, including at least $800,000 during the Relevant Period. Moreover, Defendant Liu personally signed the Offering Documents, which contained materially false and misleading statements made in connection with the IPO. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Liu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as a Company director since 2021. She also serves as a member of the Compensation Committee. She engaged in lucrative insider trading during the Relevant Period while the Company's stock price was artificially inflated, obtaining personal profits of approximately $421,729. Defendant Wong personally signed the Offering Documents, which contained materially false and misleading statements made in connection with the IPO. Moreover, Defendant Wong received $2,745,000 in total compensation during the Relevant Period. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Wong breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Gill is futile follow. Defendant Gill has served as a Company director since 2019. He also serves as the Chairperson of the Audit Committee and as a member of the Compensation Committee. Additionally, as the Chairperson of the Audit Committee, Defendant Gill is ultimately responsible for all of the false and misleading financial statements that the Company published. Moreover, Defendant Gill was obligated to ensure that the Company's internal controls over financial reporting were effective, but he failed to do so. The Company provides Defendant Gill with handsome compensation, including at least $251,218 in total compensation during the Relevant Period. Further, Defendant Gill personally signed the Offering Documents, which contained materially false and misleading statements made in connection with the IPO. As a trusted Company director and the Chairperson of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Steele is futile follow. Defendant Steele has served as a Company director since 2021. As a member of the Board, she serves as a member of the Committee, and Chairperson of the Nominating Committee. Defendant Steele received and receives handsome compensation from the Company, including $828,815 in total compensation during the Relevant Period. Moreover, Defendant Steele personally signed the Offering Documents, which contained materially false and misleading statements made in connection with the IPO. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Steele breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Vishria is futile follow. Defendant Vishria has served as a Company director since 2014. He is also a member of the Compensation Committee. He engaged in lucrative insider trading during the Relevant Period while the Company's stock price was

artificially inflated, obtaining personal profits of approximately $52,490,000. The Company also provides Defendant Vishria with handsome compensation, including at least $179,968 during the Relevant Period. Additionally, Defendant Vishria personally signed the Offering Documents, which contained materially false and misleading statements made in connection with the IPO. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Vishria breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

145.   Additional reasons that demand on Defendant Whitehurst is futile follow. Defendant Whitehurst has served as a Company director since 2021. He also serves as the Chairperson of the Compensation Committee. Additionally, Defendant Whitehurst received $4,875,771 in total compensation during the Relevant Period. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Whitehurst breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

146.   Additional reasons that demand on the Board is futile follow.

147.   Defendants Grady, Gill, Steele, and Agrawal served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, Defendants Grady, Gill, Steele, and Agrawal were responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, and the adequacy of the Company's internal controls over financial reporting. During the Relevant Period, Defendants Grady, Gill, Steele, and Agrawal failed to ensure the integrity of the Company's financial statements and internal controls, as they were charged to do under the Audit Committee Charter, thereby allowing the Company to engage in improper accounting methods and to file false and misleading financial statements with the SEC. Thus, Defendants Grady, Gill, Steele, and Agrawal breached their fiduciary duties, are not disinterested, and demand is excused as to them.

148.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

149.    Amplitude has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Amplitude any part of the damages Amplitude suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

150.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Amplitude's officers and directors, and these acts are incapable of ratification.

152.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to the stockholders of Amplitude. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Amplitude, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Amplitude to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

155.    Plaintiff on behalf of Amplitude has no adequate remedy at law.

## FIRST CLAIM
### Against Individual Defendants for Breach of Fiduciary Duties

156.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Amplitude's business and affairs.

158.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Amplitude.

160.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls. In further breach of their fiduciary duties owed to Amplitude, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the rapid revenue acceleration in the Company's 2Q21 financial results was driven by the short-term effects of the COVID-19 pandemic; (2) the positive effects the COVID-19 pandemic had on the Company's business had already subsided before the Company's September 2021 IPO as clients expanded at a reduced rate; (3) the Company's successful execution of the land-and-expand strategy was years away from accelerating revenues among new client cohorts; (4) as a result of the foregoing, the Company overstated its financial position and business prospects, including key metrics such as 2022 Fiscal Year guidance, revenue, and the successful execution of the land-and-expand strategy; and (5) the Company lacked adequate internal controls.

161.    In yet further breach of their fiduciary duties, during the Relevant Period, five of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $116 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

162.    As a result of the foregoing, Individual Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

163.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

164.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

165.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

166.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Amplitude has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.    Plaintiff on behalf of Amplitude has no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants for Unjust Enrichment

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Amplitude.

171.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Amplitude that was tied to the performance or artificially-inflated valuation of Amplitude or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

172.    Plaintiff, as a shareholder and a representative of Amplitude, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

173.    Plaintiff on behalf of Amplitude has no adequate remedy at law.

### THIRD CLAIM
### Against Individual Defendants for Waste of Corporate Assets

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

176.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

177.    Plaintiff on behalf of Amplitude has no adequate remedy at law.

### FOURTH CLAIM
### Against Individual Defendants for Abuse of Control

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Amplitude, for which they are legally responsible.

180.    As a direct and proximate result of the Individual Defendants' abuse of control, Amplitude has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff on behalf of Amplitude has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

182.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Amplitude in a manner consistent with the operations of a publicly held corporation.

184.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Amplitude has sustained and will continue to sustain significant damages.

185.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf of Amplitude has no adequate remedy at law.

**SIXTH CLAIM**
**Against Defendant Skates and Vuong For Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    Amplitude, Defendant Skates, and Defendant Vuong are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws,

the Company's liability will be in whole or in part due to Defendant Skates' willful and/or reckless violations of their obligations as officers and/or directors of Amplitude.

189.    Defendants Skates and Vuong because of their position of control and authority as officers and/or directors of Amplitude, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Amplitude, including the wrongful acts complained of herein and in the Securities Class Action.

190.    Accordingly, Defendant Skates and Defendant Vuong are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right action for contribution arising out of violations of the Exchange Act.

191.    As such, Amplitude is entitled to receive all appropriate contribution or indemnification from Defendant Skates.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Amplitude, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Amplitude;

(c)    Determining and awarding to Amplitude the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Amplitude and the Individual Defendants to take all necessary actions to reform and improve Amplitude's corporate governance and internal procedures to comply with applicable laws and to protect Amplitude and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following

actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the shareholders of Amplitude to nominate at least five candidates for election to the Board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Amplitude restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 7, 2024             Respectfully submitted,

                                   */s/    Robert C. Moest*
                                   **THE BROWN LAW FIRM, P.C.**
                                   Robert C. Moest, Of Counsel, SBN 62166
                                   2530 Wilshire Boulevard, Second Floor
                                   Santa Monica, California 90403
                                   Telephone: (310) 915-6628
                                   Facsimile: (310) 915-9897
                                   Email: RMoest@aol.com

                                   **THE BROWN LAW FIRM, P.C.**
                                   Timothy Brown
                                   767 Third Avenue, Suite 2501
                                   New York, NY 10017
                                   Telephone: (516) 922-5427
                                   Facsimile: (516) 344-6204
                                   Email: tbrown@thebrownlawfirm.net

                                   *Counsel for Plaintiff*

## **VERIFICATION**

I, Brian Hawkins, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28th day of May, 2024.

DocuSigned by:

*Brian Hawkins*
492252EBD13664DD...

Brian Hawkins